EXHIBIT A

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

IN THE CIRCUIT COURT FOR THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

| | | |
|---|---|---|
| ASHFAQ HUSSAIN SYED, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.:  19SL-CC02229-01 |
| v. | ) | |
| | ) | Division:  4 |
| FRONTIER AIR LINES, INC., | ) | |
| | ) | |
| HALLMARK AVIATION SERVICES, L.P.) | | |
| | ) | |
| Serve: Sheriff Cole County | ) | |
| | ) | |
| CSC-Lawyers Incorporating | ) | |
| Service Company | ) | |
| 221 Bolivar Street | ) | |
| Jefferson City, MO  65101 | ) | |
| | ) | |
| Defendants. | ) | |

**PETITION FOR DAMAGES AND IN CONTRACT**

Come now Plaintiffs, by counsel W. Bevis Schock, Thatcher A. Stone and William T. Woodrow, the latter two *pro hac vice*, and state for their Petition for damages and in Contract:

1.     This is an action against Frontier Air Lines Inc. and its local ground contractor, Hallmark Aviation Services, L.P.  On July 15, 2018 Jerra'Sha Young, a gate agent employed by Hallmark Aviation, wrongfully removed the four members of Plaintiffs' family from their Frontier flight, locked them in the jetway, and threatened them about similar treatment that they would receive the following day for their rebooked flight.  Plaintiffs sue for negligence per se for violation of the Tickets Act, negligent manner of removal from the airplane, intentional tort for removal from the plane, false imprisonment, and breach of contract.

**PARTIES**

EXHIBIT A

2.      Plaintiffs Ashfaq Hussain Syed and Shelly Renee Branch are single individuals who

reside together at:

        5 Country Club Dr.
        Fulton, MO, 65251

        Callaway County

3.      Plaintiff A.M.S. is an infant child, Date of Birth:  December 16, 2016, proceeding by

Next Friend Ashfaq Hussain Syed.

4.      Plaintiff N.G.S. is an infant child, Date of Birth:  December 16, 2016, A.M.S.'s twin,

proceeding by Next Friend Ashfaq Hussain Syed.

5.      A.M.S. and N.G.S. are the natural children of Syed and Branch and reside with them.

6.      Syed and Branch are a mixed-racial couple and Syed is of Middle Eastern complexion

and descent.

7.      Syed is a Sergeant First Class in the Missouri Army National Guard.

8.      Syed has a Master's Degree in nuclear engineering and works as a supervisor in the

Control Room of the Callaway Energy Center, a nuclear power plant in Callaway

County, Missouri, which is owned and operated by Ameren Corporation, a large regional

electric utility.

9.      Frontier Air Lines, Inc., ("Frontier"), is a Nevada corporation with its principal place of

business in Colorado.  Frontier has a place of business in St. Louis County, Missouri.

Frontier operates regularly scheduled commercial air service into St Louis County,

Missouri multiple times a week, and in this County sells tickets for carriage.  Frontier has

substantial revenues and expenses in St. Louis County.

10.     Frontier reached into Missouri and sold Plaintiffs the tickets that form the genesis of this

dispute.

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

EXHIBIT A

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

11.  Hallmark Aviation Services, L.P., ("Hallmark Aviation"), is a Missouri corporation in good standing.[1]

## VENUE

12.  The injuries suffered by the Plaintiffs arise directly out of the Defendants' conduct at the St. Louis Lambert International Airport which is in St. Louis County, Missouri.

## JURY DEMAND

13.  Plaintiffs demand jury trial.

## HALLMARK AVIATION AS AGENT OF FRONTIER

14.  At the time of the incident Hallmark Aviation was a contractor providing gate agent services to Frontier, and was Frontier's agent.

15.  All actions of Hallmark Aviation were performed:

   a.  To serve the business interests of Frontier according to an express or implied agreement, and

   b.  Frontier either controlled or had the right to control the physical conduct of Hallmark Aviation.[2]

16.  All actions of Hallmark Aviation, as taken through its employees, are attributable to Frontier.[3]

---

[1] A limited partnership is a separate legal entity and may sue or be sued in its own name. *Naylor Senior Citizens Hous., LP v. Side Const. Co.*, 423 S.W.3d 238, 244 (Mo. 2014).
[2] MAI 13.06.
[3] When one defendant's tort liability is vicariously based on *respondeat superior,* the other parties are not initially required to pursue their rights of recovery, contribution or indemnification from the servant whose operative negligence led to the plaintiff's injury by joining that servant.  *Rivera v. Philadelphia Theological Seminary of St. Charles Borromeo, Inc.*, 507 A.2d 1, 11–12 (Pa. 1986).  See MAI 18.01.

EXHIBIT A

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

## YOUNG AS EMPLOYEE OF HALLMARK AVIATION

17.    At the time of incident Jerra'Sha Young, ("Young") was an employee of Hallmark Aviation.

18.    At all relevant times Young's actions:

    a.    Were a part of the work she had been employed to perform,

    b.    Were done to serve the business interests of Hallmark Aviation,[4]

    c.    Were within the scope and course of her employment by Hallmark Aviation,

    d.    Although not specifically authorized by Hallmark Aviation, were done to further the business or interests of Hallmark Aviation under its general authority and direction,

    e.    Naturally arose from the performance of Hallmark Aviation's work, and

    f.    Were usual, customary and expected, that is, foreseeable, but

    g.    Were not criminal.[5]

19.    Young was merely using the opportunity afforded by the circumstances to do the harm.[6]

20.    All actions of Young as taken through its employees, are attributable to Hallmark Aviation.

## YOUNG TO HALLMARK AVIATION TO FRONTIER

21.    Because all actions by Young and other employees of Hallmark Aviation are attributable to Hallmark Aviation, and all acts of representatives of Hallmark Aviation are

---

[4] MAI 13.05.
[5] *Inman v. Dominguez*, 371 S.W.3d 921, 924 (Mo. Ct. App. 2012)
[6] *Inman v. Dominguez*, 371 S.W.3d 921, 925 (Mo. Ct. App. 2012), citing to Restatement (Second) of Agency § 231, cited in *Wellman v. Pacer Oil Co.,* 504 S.W.2d 55 (Mo. banc 1974).

EXHIBIT A

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

attributable to Frontier, all actions of Young and other employees of Hallmark Aviation are attributable to Frontier.

**PLAINTIFFS' COMPLIED WITH ALL LEGAL REQUIREMENTS**

22.    All Plaintiffs complied in all respects, whether or not material, with all legal and lawful conditions, requirements, ordinances, regulations and other legal and contractual undertakings incumbent upon them in connection with the Frontier Contract of Carriage, and with the rules and ordinances of the authorities at the airport of departure and proposed arrival, and all aircraft placards and crew member instructions.

**FACTUAL ALLEGATIONS**

23.    On Thursday, July 12, 2018 Branch went on line to Defendant's website and purchased confirmed tickets for the four Plaintiffs to fly one way from St Louis to Las Vegas, NV, departing on Sunday, July 15, 2018 at 5:59 p.m., Frontier Flight No. F9 87, confirmation No. YB517D.

24.    Syed and Branch were not certain of their return date and that was why Branch only purchased tickets for one way.

25.    Branch selected seats 40D and 40E for herself and Syed.  Because the children were under two at the time there was no charge for their travel and they were expected to sit on Syed and Branch's laps.

26.    The total fee for all four one way tickets was $211.40, which included a $30.00 bag fee for one bag and two $13.00 fees for seats reserved in advance of boarding.

27.    Branch paid for the trip with a Bank of America credit card.

28.    The purpose of the trip was for Syed and Branch to get married in Las Vegas, with their children with them, and then to go as a family to see friends on the California coast.

EXHIBIT A

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

29. During the 24 hour period before the flight Branch and Syed checked in and received boarding passes on their phones.

30. When Plaintiffs arrived at the check in counter, they encountered Young.

31. Young, even though an employee of Hallmark Aviation, was acting as an apparent agent for Frontier in that

    a. An ordinary careful person would believe that she had authority to perform all acts she did perform, on behalf of Frontier,

    b. Frontier knew or had reason to know of Young's conduct and allowed such conduct, and

    c. Plaintiffs reasonably relied on such conduct of Young at the time

32. Syed handed over to Young his military ID card with his full name:  Ashfaq Hussain Syed.

33. Young immediately became disagreeable and hostile.

34. Branch asked Young to waive the bag fee because the Frontier website offers free luggage for military personnel.

35. Young informed Plaintiffs that Syed and Branch would have to pay for the bag, despite the Frontier policy of providing free baggage carriage to military personnel.

36. Young then informed Plaintiffs that they could not sit together, despite the fact that Plaintiffs had confirmed seating together.

37. Plaintiff asked why and Young said that if Branch was going to argue and not accept that Branch and Syed could not sit together Plaintiffs would have to cancel their tickets.

EXHIBIT A

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

38.  At no time did Young explain her reason for refusing to allow Plaintiffs to sit together or explain that there was an issue with available oxygen masks for five people seated in a three seat row (the four Plaintiffs plus whoever was in 40F).

39.  Young's hostile behavior was especially hard to understand considering that Plaintiffs were traveling with two infant children flying for their first time, as Syed and Branch indicated at the outset of the interaction, and it would be readily apparent to Young or any objectively reasonable person that the family being able to sit together – even if across the aisle – would be a paramount priority for such passengers.

40.  Young re-assigned Syed to a seat on left side of the plane, approximately 3-5 rows forward of row 40, in a window seat, stating that the new seat for Syed was the closest empty seat.

41.  Young gave Syed and Branch new paper boarding passes.

42.  Syed showed Young the children's birth certificates and Young gave Syed boarding passes for the children.

43.  Young then informed Plaintiffs that as military they could both proceed through the TSA "pre-check" line.

44.  Plaintiffs went to the pre-check line and the TSA agent stated that although Syed's military ID would allow him in that line, Branch would not be allowed in that line because she lacked military ID or other paperwork to allow use of the pre-check line.

45.  Syed and Branch observed that the regular TSA line was not crowded so they proceeded to that line and went through security.

46.  After passing through security, Branch called Frontier customer service to inquire about the seating situation, because they had booked their seating in advance, arrived at the

EXHIBIT A

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

airport with confirmed seats together, and had been given no explanation for why they had been separated.

47. The Frontier customer service agent Branch reached on the phone, identity unknown to Plaintiffs, ("the First Frontier Phone Agent") told Branch that she was restoring their previous seat assignments and told Branch to inform Young that she, the First Frontier Phone Agent, had done so.

48. The First Frontier Phone Agent said that Frontier routinely booked families with small children who would ride in their parents' lap and there would be no problem.

49. When Plaintiffs arrived at the gate, they observed that Young, the same person with whom they had interacted at the baggage check-in counter,  was handling the gate.

50. When Branch informed Young that the First Frontier Phone Agent had restored their seat assignments, Young started speaking to her in a loud and irritated voice.

51. Young asked, "Who changed your seats?", and Branch told her it was the First Frontier Phone Agent.

52. Young then stated: "You will listen to me. I am the one that will tell you where you can sit, and I told you that you will not sit together."

53. Branch was made very uncomfortable by this loud and berating behavior as it was creating a scene in front of the other passengers.

54. Branch asked for an explanation of why they could not sit together and Young still provided no explanation.

55. Plaintiffs quietly took their seats in the gate waiting area as they wished to avoid further confrontation.

56. Plaintiffs pre-boarded as a family at approximately 5:30 p.m.

EXHIBIT A

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

57.   Plaintiffs walked down the aisle and approached their originally assigned seats in Row 40.

58.   At approximately that location a flight attendant confronted them and informed them that she had been made aware about them.

59.   The flight attendant then told Syed and Branch that they would not be able to sit together.

60.   Syed asked the flight attendant why they were receiving this treatment, and she informed Plaintiffs that there was an issue with the available oxygen masks with two lap infants.

61.   Syed and Branch then understood that there was a rational reason for separating them and they abandoned all thoughts and intentions to sit on the same side of the plane in the same row.

62.   Syed and Branch were then standing near their original seats, taking care of their children, and stowing their luggage.

63.   A female passenger sitting in 40F, the window seat on the right side of the plane in Plaintiff's original row, had overheard the conversation about the oxygen masks and she then offered to the flight attendant that she would sit in Syed's reassigned seat so that her seat would be empty, and there would be enough oxygen masks for Plaintiff's family to sit together as four people in one row.

64.   The flight attendant stated to the woman in 40F "that will not work."

65.   The flight attendant left Plaintiffs' immediate area.

66.   Plaintiffs were still in the area of row 40.

67.   A passenger then walked toward where Plaintiffs were standing.

68.   It appeared to Plaintiffs that he was assigned to 39D.

EXHIBIT A

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

69.    Syed asked that passenger if he would swap seats so that this passenger would take the seat in approximately row 35 to which Syed was now assigned, so that Syed and one child could sit in closer proximity to Branch and the other child.

70.    The man good-naturedly agreed, sat down in Syed's assigned seat, and proceeded to put his head back in such a manner that he appeared to be falling asleep.

71.    At this point, all Plaintiffs were in aisle seats, in adjacent rows, one behind the other, with each adult holding a child in his or her lap, and consequently there was no potential issue with oxygen masks.

72.    The plane sat at the gate for what seemed an unusually long time.

73.    The plane was nearly full.

74.    While waiting for departure Syed and Branch did not witness any passengers make any complaint about them to any crew member.

75.    Plaintiffs had no interaction with the crew during this interval.

76.    During this interval, Plaintiffs had brief interactions with other passengers who were charmed by the babies and Syed and Branch otherwise exchanged pleasantries with the other passengers, including the fact that it was the family's first flight together.

77.    A passenger across the aisle asked if she could take a picture of the family on its first flight together and Syed and Branch agreed.

78.    Branch gave the passenger her phone and the passenger took the picture at approximately 6:07 p.m.

79.    Branch posted this picture to Facebook at 6:10 p.m.

80.    Shortly thereafter, Young boarded the plane, marched up to the Plaintiffs, pointed her finger in Syed and Branch's faces, and said: "You and you get your stuff."

EXHIBIT A

81.    Syed and Branch, wordlessly complied by getting their carry on items and children together and followed Young down the aisle.

82.    When they reached the front of the plane Branch asked Young where they were going and she said: "Off."

83.    When Branch asked why, Young informed Syed and Branch that they would be told once they were off the plane.

84.    As they exited the plane into the jetway area just off the airplane Young remained in the airplane doorway.

85.    Branch saw another Frontier employee and asked that person to speak to a supervisor.

86.    Branch recalls that the person stated that she was a supervisor and introduced herself as "Dez", (sp?).

87.    "Dez" was on a walkie-talkie assisting with retrieving Plaintiff's stroller out of the plane's baggage hold.

88.    "Dez" stated in response to an inquiry from Branch that Plaintiffs were being removed from the plane because the "passengers and flight attendants felt uncomfortable with Plaintiffs being on the plane.

89.    Dez then left the area via the jetway.

90.    Branch again asked Young why they were being removed from the flight and Young stated that it was because they had made "the flight attendants and passengers uncomfortable."

91.    At this point, Plaintiffs observed Young, the flight attendant and another unidentified employee snickering at them from the open plane door.

92.    Plaintiffs further pressed the Frontier employees for an explanation but received none.

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

EXHIBIT A

93. A Frontier employee or representative brought Plaintiff's stroller to the area of the jetway where there is a set of stairs to the tarmac.

94. Branch began putting the children in the stroller.

95. Young then pushed past the Plaintiffs, proceeded up the jet way with Plaintiffs following well behind, and closed the jet way's terminal door, leaving Plaintiffs in the jet way.

96. Branch pushed on the terminal jetway door but it would not open.

97. Branch went back to the airplane end of the jet way and found that the airplane door was closed.

98. At that point Plaintiffs were locked in the jet way tunnel, with a locked door to the terminal on one side and a locked plane door on the other side.

99. Plaintiff s remained locked in this tunnel, and were unable to exit.  It was hot, they were sweating, and the babies were screaming.  They sat down because of the heat.

100. Frontier controlled the exits of the jet way.

101. Syed and Branch understood that it would be unlawful to go out the jetway door leading to the stairway to the tarmac and did not attempt that method of leaving the jetway.

102. While still in the jetway Branch called Frontier customer service by her cell phone and a Frontier customer phone service agent, (the "the Second Frontier Phone Agent"), answered.

103. Branch explained the family's circumstances and the Second Frontier Phone Agent said that her records showed that they were on the plane.

104. Branch explained that the family was in the jetway.

105. The Second Frontier Phone Agent stated that she would get someone to let them out.

EXHIBIT A

106.  Branch was diagnosed years ago for migraine headaches.  Her migraines are sometimes caused by stress.

107.  Branch began developing a headache, likely a migraine, from the stress.

108.  A Frontier Employee opened the terminal door to the jetway and standing next to that person was Young.

109.  The amount of time Plaintiffs and their children were locked in the jetway tunnel is unknown but Plaintiffs estimate a few minutes, approximately 3-10 minutes, and it felt like a very long time.

110.  At some point Branch asked the Frontier representatives to retrieve Plaintiffs' luggage.

111.  The Frontier representatives initially resisted that request due to expected delay, but when Branch explained that her car keys were in the luggage the Frontier representatives complied and Plaintiffs received their luggage.

112.  Branch then initiated another cell phone call to customer service.

113.  Branch spoke to a third telephone customer service agent to request that the family's flight be re-booked.

114.  In the alternative Plaintiff was on hold from the original call and the conversation was a continuation of the call with the Second Frontier Phone Agent – Plaintiff has no clear memory of which it was.  (Plaintiff will hereafter refer to this conversation as being with the "Third Frontier Phone Agent").

115.  The Third Frontier Phone Agent informed Plaintiffs that an agent on the scene needed to make a computer entry showing them as removed from the flight so that rebooking could take place.

EXHIBIT A

116.   The only agent on the scene was Young, so Branch asked the Third Frontier Phone Agent if she, Branch, could put her phone on speaker and the Third Frontier Phone Agent agreed.

117.   A speaker phone conversation ensued between the Third Frontier Phone Agent, Syed, Branch and Young.

118.   Young initially refused to comply with the Third Frontier Phone Agent's request to change Plaintiff's status from on the flight to off the flight, but eventually, grudgingly, did so, after the Third Frontier Phone Agent confronted her and told her it was the least she could do.

119.   The Third Frontier Phone Agent re-booked Plaintiffs for the next day and the phone call ended.

120.   As Plaintiffs were walking away, Young was standing with two other individuals, including "Dez", looking at Plaintiff, and Young started making comments to the Plaintiffs.  Branch was taking a video at this point.  Young said:  "Ma'am I didn't even give you permission to record me and that's illegal.  See you tomorrow."

121.   Plaintiffs ignored this comment and kept walking, at which point Young followed them, walked in front, turned around and stopped them, and said: "I don't think you heard me. I will see you at the gate tomorrow.  It's the exact same crew as today." She then smiled widely and walked away.

122.   Soon thereafter Syed called customer service and confirmed that it was indeed the exact same crew the next day, at which point he cancelled their flight.

123.   Syed later went on-line to the feedback page filed a written complaint with Frontier stating the above story in abbreviated form.

124. It is not illegal to take videos of flight attendants and/or otherwise take videos on airplanes, 49 U.S.C. 46504.

125. In any case Syed and Branch neither took video on the airplane nor harassed flight attendants.

126. It is not illegal for customers to trade seats.

127. Syed's on-line complaint contains an error in that it suggests that Plaintiffs learned of the issue of too many people in the row for the oxygen masks earlier than they actually received that information.

128. Syed called Frontier approximately the next day, spoke to "Lisa", told the story, and asked for the family's money back.

129. Frontier opened investigation No. 180821-001664.

130. Approximately two days later a Frontier representative named "Beth" called Plaintiff Syed's phone and spoke to Syed and Branch by speaker phone.

131. Beth stated that they had investigated the complaint and found that Syed was taking videos after being told by flight attendants to stop, harassing flight attendants, and asking customers to trade seats.

132. On August 21, 2019 "Beth" sent an e-mail to Syed stating that he would receive a refund on the credit card ending in 0676.

133. Plaintiffs have never received a refund on that card or any other card or by any other method.

134. Approximately two months later Branch wrote a Facebook post describing their experience, which generated considerable social media outrage.

EXHIBIT A

135.    A number of individuals, including Donna Stern, Branch's mother, contacted Frontier

and/or posted on Facebook to complain about Frontier's behavior.

136.    Frontier replied by e-mail to some of those who complained by defending its position.

137.    "Beth", Frontier's investigator, wrote to Branch's mother, Donna Stern, on September 13,

2018 at 4:49 p.m. and stated:

    a.    The children "were not included on their reservation".

    b.    "The parent who had been reassigned was now back in their (sic) original seat",

    c.    The "parents were not complying with crew member instructions and insisted on

flying in a way that could jeopardize safety of flight".

    d.    "They were provided with a refund".

### NO COMPARATIVE FAULT

138.    Plaintiffs were not at fault in any way.

### NO LEGAL JUSTIFICATION

139.    There was no legal justification for Frontier to throw Plaintiffs off the flight or imprison

Plaintiffs in the jetway.

### DAMAGES

140.    Plaintiffs did not receive the benefit of their contract with Frontier because Frontier did

not provide transportation to Plaintiff's family from St. Louis to Las Vegas on July 15,

2018.

141.    Due to the cancellation of their tickets and the bad experience described herein, among

other reasons, Syed and Branch have not yet married.

142.    All Plaintiffs lost the benefits associated with their expected trip to Las Vegas and the

west coast.

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

EXHIBIT A

143.    Syed and Branch suffered garden variety emotional damages from the loss of the

transportation to Las Vegas.

144.    During the time Plaintiffs' were imprisoned in the jetway all four Plaintiffs suffered fear,

loss of liberty, uncomfortable conditions, humiliation, indignity, disgrace, stress,

embarrassment and, mental suffering.

## JOINT AND SEVERAL LIABILITY

145.    Each defendant was negligent and the negligence of each combined with that of the

others, and therefore each is liable, although the negligence of any one was not the sole

negligence or the sole proximate cause, and although the negligence of one, without such

other independent, intervening cause, would not have produced the injury.[7]

## PUNITIVE DAMAGES – NEGLIGENCE, NEGLIGENCE PER SE

146.    Defendants' conduct in throwing Plaintiffs off the flight, through the actions of Young

and other representatives of Defendants, all acting with actual or apparent authority,

showed complete indifference to or conscious disregard for harm to others.

## PUNITIVE DAMAGES - INTENTIONAL TORT AND FALSE IMPRISONMENT

147.    Defendants' conduct in throwing Plaintiffs off the flight and imprisoning Plaintiffs in the

jetway, through the actions of Young and other representatives of Defendants all acting

with actual or apparent authority, was outrageous because of the Defendants' authorized

representatives' evil motives and/or reckless indifference to the rights of Plaintiffs.

148.    Defendants' conduct, through the actions of its authorized agents, from the moment

Plaintiffs arrived at the check-in counter until they left the airport, showed complete

indifference to and/or conscious disregard for the safety and rights of Plaintiffs.

---

[7] *Gaines v. Property Servicing Company*, 276 S.W.2d 169 (Mo. 1955), and see MAI 19.01.

17

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

EXHIBIT A

## UNFAIR OR DECEPTIVE PRACTICE
## TO BUMP PAYING PASSENGERS FOR NO REASON

149.    The "Transparency Improvements and Compensation to Keep Every Ticketholder Safe

Act of 2017" or the "TICKETS Act", Public Law No: 115-254, Title IV, Subtitle A, Sec.

425, HR 302, passed by both houses and signed by the president, effective October 5,

2018, ("the statute"), (which is a date after this incident}, states in relevant part:

>    It shall be an unfair or deceptive practice under subsection (a) for an air carrier or

>    foreign air carrier subject to part 250 of title 14, Code of Federal Regulations, to

>    involuntarily deplane a revenue passenger onboard an aircraft, if the revenue

>    passenger—

>    (A)    is traveling on a confirmed reservation; and

>    (B)    checked-in for the relevant flight prior to the check-in deadline.

150.    When Defendants expelled Plaintiffs from the airplane, Defendants violated this Act,

(although the act was not yet effective).

## COUNT I – NEGLIGENCE

### Intentionally Omitted

## COUNT II – NEGLIGENCE PER SE
### Violation of TICKETS Act
### Plaintiffs Against both Defendants

151.    Plaintiffs incorporate all prior paragraphs.

152.    Plaintiffs checked in prior to the check-in deadline.

153.    Plaintiffs entered and went to their seats on the airplane as paid passengers with

confirmed reservations.

154.    Defendants forced Plaintiffs to involuntarily deplane.

EXHIBIT A

155.   The TICKETS Act, albeit enacted into law after this incident, defines the duty of the common carrier to transport paying passengers.[8]

156.   Pursuant to the statute under these circumstances it was an unfair or deceptive practice to involuntarily deplane Plaintiffs.

157.   Defendants, through their authorized representatives, violated the statute.

158.   Plaintiffs are members of the class of persons intended to be protected by the statute.

159.   The damages outlined above are the kind of damages the statute was designed to prevent.

160.   The violation of the statute was the cause of Plaintiffs' damages.[9]

161.   Defendants' conduct, through their authorized representatives, showed complete indifference to and/or conscious disregard for harm to others.[10]

162.   Defendants' conduct, through their authorized representatives, demonstrated conscious negligence tantamount to intentional wrongdoing because Defendants' authorized agents were conscious of their conduct, and, though, in the alternative, having no specific intent to injure, must have been conscious, from their knowledge of surrounding circumstances and existing conditions, that their conduct would naturally or probably result in injury[11] and/or that there was a high probability that their conduct would result in injury.[12]

WHEREFORE, on Count II Plaintiffs pray for judgment against Defendants and each of them under the theory of negligence per se for compensatory damages in excess of $25,000.00,

---

[8] Plaintiffs are unaware of any precedent stating that a later enacted statute may not relate back in a negligence per se claim.
[9] *Martinez v. Kilroy Was Here LLC*, 551 S.W.3d 491, 496 (Mo. Ct. App. 2018)
[10] *Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc./Special Prods., Inc.*, 700 S.W.2d 426, 435 (Mo. banc 1985), MAI 10.02.
[11] *Tubbs v. BNSF Ry. Co., Inc.*, 562 S.W.3d 323, 340–41 (Mo. Ct. App. 2018)
[12] *Poage v. Crane Co.*, 523 S.W.3d 496, 515 (Mo. App. E.D. 2017) (quoting *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 164 (Mo. App. W.D. 1997) (en banc)), *Oyler v. Hy-Vee, Inc.*, 539 S.W.3d 742, 746 (Mo. Ct. App. 2017)

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

EXHIBIT A

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

punitive damages, costs, and for such other relief as the court finds to be just, meet and reasonable.

### COUNT III – FAILURE TO USE HIGHEST DEGREE OF CARE
#### Manner of Removal from Plane
#### Plaintiffs Against both Defendants

163.   Plaintiffs incorporate all prior paragraphs.

164.   Once Plaintiffs were on the airplane, Defendants and their agents and employees had a duty as a common carrier to exercise highest degree of care a very careful person would use under the same or similar circumstances for the well-being and treatment of their passengers.[13] [14]

165.   It was reasonably foreseeable that Defendants and their agents' and employees improper treatment of the Plaintiffs in the manner in which they were removed from the plane would result in aggravation, inconvenience, distress, and would deprive them of their family trip.

166.   Defendants and their agents and employees breached the duty of a common carrier to Plaintiffs by the cruel and callous manner by which they ejected Plaintiffs from the aircraft, including by drawing attention to Plaintiffs as though they were criminals in front of all the passengers, by terrifying Plaintiffs, leaving them in a locked jetway, and intimidating them into cancelling their rescheduled flight.

167.   As a result, all Plaintiffs suffered monetary damages, inconvenience, embarrassment, and emotional distress from this outrageous conduct, which continue to affect all Plaintiffs.

---

[13] *Boyette v. Trans World Airlines, Inc.*, 954 S.W.2d 350, 354 (Mo. Ct. App. 1997)
[14] MAI 11.01

20

EXHIBIT A

WHEREFORE, on Count III Plaintiffs pray for judgment against Defendants and each of them under the theory of failure to use highest degree of care in the manner of removal from the airplane for compensatory damages in excess of $25,000.00, punitive damages, costs, and for such other relief as the court finds to be just, meet and reasonable.

### COUNT IV – INTENTIONAL TORT
**Intentional Removal from Plane**
**All Plaintiffs Against both Defendants**

168.  Plaintiffs incorporate all prior paragraphs.

169.  Defendants, through their authorized representatives, intentionally removed Plaintiffs from the plane.

170.  At the time there was no statute, law or regulation specifically making unlawful the removal of Plaintiffs from the plane.

171.  The removal of Plaintiffs from the plane caused Plaintiffs damages as outlined above.

172.  There was no justification and/or there was insufficient justification for Defendants' removal of Plaintiffs from the plane.[15]

173.  Defendants' conduct, through their authorized representatives, was outrageous because of Defendants' evil motive or reckless indifference to the safety and rights of others.[16]

WHEREFORE, on Count IV Plaintiffs pray for judgment against Defendants and each of them under the theory of intentional tort for compensatory damages in excess of $25,000.00, punitive damages, costs, and for such other relief as the court finds to be just, meet and reasonable.

### COUNT V – INTENTIONAL TORT
**False Imprisonment in the Jetway**

---

[15] *Porter v. Crawford & Co.*, 611 S.W.2d 265, 268 (Mo. App. 1980), *Billingsley v. Farmers All. Mut. Ins. Co.*, 555 S.W.3d 1, 6–7 (Mo. Ct. App. 2018).
[16] MAI 10.01

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

EXHIBIT A

**Plaintiffs against both Defendants**

174. Plaintiff incorporates all prior paragraphs.

175. By confining Plaintiffs into the overheated jet way with no exit, Young knowingly and unlawfully constrained Plaintiffs and completely restricted their movement without their consent.

176. The Plaintiffs were aware that they had been locked in the jetway and were not free to leave, which was a substantial interference with their liberty.

177. The actions of Defendants and their agents were reasonably foreseeable in that the actions of Defendant's agents were within the scope of their employment.

178. As a result Plaintiffs suffered damages including humiliation, heat duress, mental anguish, and fear for their wellbeing and that of their children.

179. Defendants' conduct, through their authorized representatives, was outrageous because of Defendants' evil motive or reckless indifference to the rights of others. [17]

WHEREFORE, on Count V Plaintiffs pray for judgment against Defendants and each of them under the theory of false imprisonment for compensatory damages in excess of $25,000.00, punitive damages, costs, and for such other relief as the court finds to be just, meet and reasonable.

### COUNT VI - BREACH OF CONTRACT
**Breach of Contractual Duty to Transport Plaintiffs to Las Vegas**
**Plaintiffs against Frontier**

180. Plaintiff incorporates all prior paragraphs.

181. Plaintiffs and Defendant Frontier entered into a contract of carriage to transport Plaintiffs from St Louis, MO to Las Vegas, NV.

---

[17] MAI 10.01

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

EXHIBIT A

182.    As consideration for this contract, Plaintiffs paid $211.40.

183.    Plaintiffs complied in every way with the conditions of the contract.

184.    Under the terms of the contract, Frontier may refuse carriage for a limited set of reasons, none of which were applicable when they refused to carry Plaintiffs.

185.    By refusing to carry Plaintiffs after they had purchased valid tickets and engaged in a binding contract, Defendant Frontier breached the contract by its refusal to perform.

186.    As a result, Plaintiffs suffered (a) actual, (b) consequential and (c) benefit of the bargain damages[18] as a direct result of Defendant Frontier's breach, in an amount to be determined at trial.

WHEREFORE, on Count VI Plaintiff prays for compensatory damages in a fair and reasonable amount for breach of contract against Defendant Frontier, court costs, and for such other relief as the court finds to be just, meet and reasonable.

Respectfully Submitted,

Attorneys for Plaintiff

  /s/ W. Bevis Schock   .
W. Bevis Schock, MBE # 32551
Attorney at Law
7777 Bonhomme Ave., Ste. 1300
St. Louis, MO  63105
wbschock@schocklaw.com
Fax:    314-721-1698
Voice: 314-726-2322

  /s/ Thatcher A. Stone   .
*pro hac vice*
Stone & Woodrow LLP
250 West Main St. Suite 201
Charlottesville, VA 22902
thatcher@stoneandwoodrowlaw.com

---

[18] *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.2d 522, 531 (Mo Banc. 1983), *Curators of the University of Missouri v. Suppes*, WD81278, January 8, 2019, 2019 WL 121983.

Electronically Filed - St Louis County - January 28, 2020 - 12:38 PM

EXHIBIT A

Fax:    646 873-7529
Voice: 855-275-7378

    /s/ William T. Woodrow    .
*pro hac vice*
Stone & Woodrow LLP
250 West Main St. Suite 201
Charlottesville, VA 22902
will@stoneandwoodrowlaw.com
Fax:    646 873-7529
Voice: 855-275-7378

CERTIFICATE OF SERVICE

The undersigned certifies that on January 28, 2020 he served this document on:
All counsel of record
    /s/ W. Bevis Schock    .
The service method was:  electronic filing on David Berwin, and e-mail on *pro hac vice* counsel,
Tara Shelke and Brian T. Maye.