## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| ASHFAQ HUSSAIN SYED, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )   Case No. 4:20-cv-00407-MTS |
| | ) |
| FRONTIER AIRLINES, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Hallmark Aviation Services, L.P.'s[1] ("Hallmark") Motion to Dismiss and to Strike, Doc. [10].  The Motion is fully briefed, and the Court heard oral argument.  For the reasons stated herein, the Court will grant in part and deny in part the Motion to Dismiss and to Strike.

## I.      Background[2]

Plaintiffs Ashfaq Hussain Syed and Shelly Renee Branch booked a flight for themselves and their infant twins to Las Vegas, Nevada.  Doc. [1-1] ¶ 23.  Branch paid $211.40, including fees, for two tickets on a Frontier Airlines flight to Las Vegas scheduled to depart St. Louis at 5:59 p.m. on Sunday, July 15, 2018.  *Id.* ¶¶ 23, 26.  Plaintiffs assert that because their children were under two at the time there was no charge for the children's travel, and "they were expected to sit on" their parents' laps.  *Id.* ¶ 25.  Once in Las Vegas with their infant children, Plaintiffs planned to marry and then to go see friends and family on the California coast.  *Id.* ¶ 28.  But

---

[1] Defendant Frontier Airlines, Inc. ("Frontier" or "Frontier Airlines") moved to adopt and join this motion, Doc. [34], which the Court granted, see Doc. [45].
[2] At this stage of the litigation, the Court accepts Plaintiffs' well-pleaded facts as true.  These facts are set forth solely for ruling on this Motion to Dismiss.  The Court expresses no opinion or judgment on the veracity of the facts herein, and they do not relieve any party of the burden of presenting evidence later in these proceedings.

their planned trip to the West went south after a string of disputes with Hallmark and Frontier staff over Plaintiffs' seat assignments led to their eventual removal from the flight.

When they arrived at the airport on their planned day of departure, they headed to the check-in counter, where they first encountered Jerra'Sha Young, an employee of Hallmark Aviation.[3]  *Id.* ¶ 30.  Plaintiffs allege that Young was "disagreeable and hostile" from the start and declined to waive the bag fee for their checked luggage despite Syed's veteran status.  *Id.* ¶¶ 33, 35.  Next, Young informed Plaintiffs that they "could not sit together" even though Plaintiffs had confirmed their adjoining seat assignments during their purchase.  *Id.* ¶ 36.  When Plaintiffs asked why, Young informed them that if they "argue[d]" and did "not accept [i]t," then Plaintiffs' tickets would be canceled.  *Id.* ¶ 37.  Young provided the family their boarding passes, which contained their new seat assignments, and they proceeded to security.  *Id.* ¶¶ 41, 42, 45.

Once through security, Branch called Frontier's customer service line "to inquire about the seating situation."  *Id.* ¶ 46.  The agent on the phone restored the Plaintiffs' previous seat assignments and told Branch to inform Young that the agent had done so.  *Id.* ¶ 47.  When they arrived at the gate, Plaintiffs observed that Young was now stationed there, and Plaintiffs told her that the phone agent had "restored their seat assignments."  *Id.* ¶¶ 49, 50.  In a "loud and irritated voice," Young said to them: "You will listen to me.  I am the one that will tell you where you can sit, and I told you that you will not sit together."  *Id.* ¶¶ 50, 52.  Young's words and demeanor purportedly made Branch "very uncomfortable."  *Id.* ¶ 53.  Plaintiffs "quietly" sat down at the gate waiting area as to "avoid further confrontation."  *Id.* ¶ 55.

At approximately 5:30 p.m., Plaintiffs pre-boarded their flight, walked down the airplane's aisle, and approached their "originally assigned seats in Row 40."  *Id.* ¶¶ 56, 57.  A flight attendant informed Branch and Syed that she "had been made aware" of them and that they

---

[3] Frontier contracted Hallmark to provide it gate agent services.  Doc. [1-1] ¶ 1.

"would not be able to sit together." *Id.* ¶ 58, 59.  Syed asked the flight attendant "why they were receiving this treatment," and the flight attendant explained that no row in the airplane was equipped with enough oxygen masks to accommodate two lap infants—meaning that if Syed and Branch sat in the same row with the infants, someone would have been without a life-sustaining supplemental oxygen supply in the event of an emergency.  *Id.* ¶ 60; *see also* 14 C.F.R. § 91.211.  Syed and Branch "then understood" the "rational reason" for separating them, and the two claim they then "abandoned all thoughts and intentions to sit on the same side of the plane in the same row."  Doc. [1-1] ¶ 61.

Syed and Branch, still standing near their original seats, began to stow their luggage and care for their infants when a passenger in seat 40F, who apparently had overheard their conversation with the flight attendant, offered to sit in Syed's reassigned seat so that her seat would be empty to allow Plaintiffs to sit together.  *Id.* ¶ 63.  The flight attendant stated that it "w[ould] not work" and walked away.  *Id.* ¶ 64, 65.  Then, another passenger walked towards where Plaintiffs were standing.  *Id.* ¶ 67.  It somehow "appeared" to Plaintiffs that the passenger "was assigned to 39D," so Syed asked the passenger whether he would "swap seats" so that the passenger "would take the seat in approximately row 35 to which Syed was now assigned, so that Syed and one child could sit in closer proximity to Branch and the other child."  *Id.* ¶ 68, 69.  The passenger "good-naturedly agreed."  *Id.* ¶ 70.

At that point, Branch and Syed were in aisle seats of adjacent rows, one behind the other, each holding one infant in their laps.  *Id.* ¶ 71.  The "nearly full" plane sat at the gate "for what seemed an unusually long time."  *Id.* ¶¶ 72, 73.  Branch and Syed "exchanged pleasantries" with other passengers.  *Id.* ¶ 76.  Branch gave her phone to one passenger after she asked if she could take a picture of them.  *Id.* ¶¶ 77, 78.  Branch posted that picture to Facebook at 6:10 p.m.  *Id.*

¶ 79.  Shortly thereafter, Young boarded the plane, "marched up to" Plaintiffs, and pointed her finger in both their faces saying, "you and you get your stuff."  *Id.* ¶ 80.

Syed and Branch "wordlessly complied."  *Id.* ¶ 81.  They retrieved their carry-on items and followed Young down the aisle.  *Id.*  When they reached the front of the plane, Branch asked Young where they were going.  *Id.* ¶ 82.  "Off," Young replied.  *Id.*  When Branch asked why, Young said that they would be told once they were off the plane.  *Id.* ¶ 83.  Syed and Branch exited while Young remained in the airplane's doorway.  *Id.* ¶ 84.  Branch "saw another Frontier employee" and asked her to speak to a supervisor.  *Id.* ¶ 85.  That employee introduced herself as "Dez" and identified herself as a supervisor.  *Id.* ¶ 86.  Branch asked Dez why they were removed, and Dez told them that "passengers and flight attendants felt uncomfortable with Plaintiffs being on the plane."  *Id.* ¶ 88.  Dez then left the area via the jet bridge.  *Id.* ¶ 89.

Branch once again asked Young why Plaintiffs were being removed from the flight.  *Id.* ¶ 90.  Young echoed Dez and said Plaintiffs had made "the flight attendants and passengers uncomfortable."  *Id.*  At that point, Plaintiffs claim to have "observed" Young, the flight attendant, and another unidentified employee "snickering at them" from the open plane door.  *Id.* ¶ 91.  A Frontier "employee or representative" then brought Plaintiffs their stroller from the apron below.  *Id.* ¶ 93.  Branch began fastening the children in the stroller.  *Id.* ¶ 94.  Young then "pushed past" them, proceeded up the jet bridge, and closed the jet bridge's terminal door while Plaintiffs were "well behind."  *Id.* ¶ 95.  When Branch reached the jet bridge door to the terminal, she "pushed on" it, but it would not open.  *Id.* ¶ 96.  Branch went back to the "airplane end" of the jet bridge and found the airplane's door closed.  *Id.* ¶ 97.  Thus, Plaintiffs were in the jet bridge with two "locked" doors on each end.[4]  *Id.* ¶ 98.  They were "hot" and "sweating," and

---

[4] Though Plaintiffs could have gone out the jet bridge door with a stairway to the apron, they "did not attempt that method of leaving" the jet bridge because they "understood" that it would be "unlawful." Doc. [1-1] ¶ 101.

the infants were "screaming." *Id.* ¶ 99.  Branch began developing a headache, "likely a migraine, from the stress." *Id.* ¶ 107.

While "locked" in the jet bridge, Branch again called Frontier's customer service line and told the telephone agent what happened and how the family was in the jet bridge. *Id.* ¶¶ 102, 104.  The telephone agent said her records showed that Plaintiffs were on the plane, but she said she would get someone to let Plaintiffs out of the jet bridge. *Id.* ¶¶ 103, 105.  Eventually, a Frontier employee and Young opened the terminal door to the jet bridge. *Id.* ¶ 108.  Plaintiffs do not know how long they were "locked" in the jet bridge, but they estimate "a few minutes, approximately 3–10." *Id.* ¶ 109.

Now out of the jet bridge, Branch initiated another call to Frontier customer service and spoke to a third telephone agent[5] to request that the airline rebook the family's flight. *Id.* ¶ 113.  That agent informed Branch that an agent at the airport needed to make a computer entry showing that Plaintiffs were removed from the flight so that they could be rebooked. *Id.* ¶ 115.  Branch asked the telephone agent whether it would be alright to place the telephone agent on speakerphone so that the telephone agent could speak to Young. *Id.* ¶ 116.  The telephone agent agreed, and a conversation over speakerphone between the telephone agent, Young, Branch, and Syed ensued. *Id.* ¶¶ 116, 117.  Initially, Young "refused to comply" with the telephone agent's request to change Plaintiffs' status from on the flight to off it, but "eventually" Young "grudgingly" did so. *Id.* ¶ 118.  The telephone agent then rebooked Plaintiffs for the next day, and the call ended. *Id.* ¶ 119.

"As Plaintiffs were walking away" Branch was recording video. *Id.* ¶ 120.  Young told Branch that she did not give her permission to record her. *Id.*  Young then said "see you

---

[5] Plaintiffs also plead in the alternative that Branch was "on hold from the original call" making this conversation a "continuation of the call" with the second Frontier phone agent.  Doc. [1-1] ¶ 114; *see also* Fed. R. Civ. P. 8(d)(2).

tomorrow" to Plaintiffs.  *Id.* ¶ 120.  Plaintiffs "ignored" the comment and kept walking.  *Id.*
¶ 121.  Young walked ahead of them, turned around, stopped them, and said, "I don't think you
heard me.  I will see you at the gate tomorrow.  It's the exact same crew as today."  *Id.*  Young
"smiled widely" and walked away.  *Id.*  Syed later called Frontier's customer service, which
somehow was able to confirm to him that "the exact same crew" would be working the next day.
*Id.* ¶ 122.  Syed then cancelled their flight.  *Id.*

Syed submitted an online complaint to Frontier and called them the following day to
request his money back.  *Id.* ¶¶ 123, 128.  Frontier opened an investigation.  *Id.* ¶ 129.  An agent
informed Plaintiffs that Frontier "found that Syed was taking videos after being told by flight
attendants to stop, harassing flight attendants, and asking customers to trade seats."  *Id.* ¶ 131.
Nevertheless, the agent told Syed that he would receive a refund.  *Id.* ¶ 132.  Plaintiffs, however,
claim they never have received a refund.  *Id.* ¶ 133.  Around two months later, Branch wrote a
Facebook post describing Plaintiffs' experience.  *Id.* ¶ 134.  "A number of individuals" contacted
Frontier or posted on Facebook to complain about Frontier's behavior that Branch had described.
*Id.* ¶ 135.  Frontier responded to some and noted that Syed and Branch "were not complying with
crew member instructions and insisted on flying in a way that could jeopardize safety of flight."
*Id.* ¶¶ 136, 137.

Plaintiffs brought this suit in the Circuit Court of St. Louis County against Frontier and
Hallmark alleging six counts.  Count I alleges negligence but now has been omitted and exists
only as a place holder for consistency.  Count II alleges negligence per se by way of the
TICKETS Act, see Pub. L. No. 115-254, Div. B, Title IV, § 425, 132 Stat. 3338.  Count III
alleges negligence in the "manner of removal from [the] plane."  Doc. [1-1] at 20.  Count IV
alleges, in the alternative to Count III, an intentional tort for the lawful but outrageous
"intentional removal" of Plaintiffs from the plane.  *Id.* at 21.  Count V alleges false imprisonment

in the jet bridge.  Lastly, Count VI alleges breach of contract, or the "breach of contractual duty to transport Plaintiffs to Las Vegas."  *Id.* at 22.  Plaintiffs allege Counts II through V against both Defendants but allege Count VI only against Frontier.

Hallmark timely removed the case to this Court on the basis of diversity, *see* 28 U.S.C. § 1441, and subsequently moved for the dismissal of all claims against it.  Frontier moved to join the Motion, Doc. [34], which the Court granted, *see* Doc. [45].  Defendants argue that the Airline Deregulation Act preempts Counts II through V.  *See* Pub. L. No. 95-504, 92 Stat. 1705 (1978) (codified in part at 49 U.S.C. § 41713).  Preemption aside, Defendants argue that Plaintiffs have failed to state a claim for Counts II, III, and IV.  Count II, Defendants argue, fails because the TICKETS Act, on which Plaintiffs base their negligence per se claim, was not in effect at the time of the incident and cannot be applied as a retroactive standard of care.  Count III, Defendants argue, fails because Plaintiffs did not allege an actionable injury.  And Defendants argue Count IV fails because Plaintiffs did not plead the essential elements of a prima facie tort.

## II.      Standard of Review

Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  If a pleading fails to state a claim upon which relief can be granted, an opposing party may move to dismiss it.  *See* Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted).  The factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 861 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).  If a claim fails to allege one of the elements necessary to recovery on a legal theory, that claim must

be dismissed for failure to state a claim upon which relief can be granted. *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011).

When ruling on a motion to dismiss, the Court "must liberally construe a complaint in favor of the plaintiff," *Huggins v. FedEx Ground Package System, Inc.*, 592 F.3d 853, 862 (8th Cir. 2010), and must grant all reasonable inferences in its favor, *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010). Although courts must accept all factual allegations as true, they are not bound to take as true "a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted); *Iqbal*, 556 U.S. at 677–78. Indeed, "[c]ourts should dismiss complaints based on 'labels and conclusions, and a formulaic recitation of the elements of a cause of action.'" *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) (quoting *Twombly*, 550 U.S. at 555).

## III.    Discussion

### a.  Preemption

The Airline Deregulation Act ("ADA") preempts state laws, regulations, and other provisions having the force and effect of law[6] that are "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). It preempts both state laws specifically addressed to the airline industry and generally applicable laws that indirectly relate to air carriers' prices, routes, or services. *Watson v. Air Methods Corp.*, 870 F.3d 812, 817 (8th Cir. 2017) (en banc). Defendants argue that the ADA preempts Plaintiffs' tort claims here—Count II (negligence per se), Count III (negligent manner of removal), Count IV (intentional tort in manner of removal), and Count V (false imprisonment in the jet bridge).

---

[6] Claims under state common law have the "force and effect of law" for ADA purposes. *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 282–84 (2014).

As a threshold matter, Plaintiffs argue that the ADA does not preempt the claims against Hallmark because Hallmark, Plaintiffs say, is not an "air carrier."  But because the claims alleged in this suit stem from Hallmark acting as an agent of Frontier, which is an "air carrier," the Court finds that the ADA applies to Hallmark in this case.  It is not necessary for Hallmark itself to be an "air carrier" because Missouri may not "enact or enforce a law" "*related to* a price, route, or service of an air carrier." § 41713 (emphasis added); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("State enforcement actions having a connection with or reference to airline 'rates, routes, services' are pre-empted.").  If Hallmark's actions here on behalf of an air carrier relate to the air carrier's prices, routes, or services, then the ADA preempts the claims for both Hallmark and Frontier.  *See Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 287 n.8 (5th Cir. 2002) ("ADA preemption is not limited to claims brought directly against air carriers"); *Huntleigh Corp. v. La. State Bd. of Priv. Sec. Exam'rs*, 906 F. Supp. 357, 362 (M.D. La. 1995) (agent of air carrier with whom it had contracted to perform pre-departure security screening was within the reach of the ADA); *Marlow v. AMR Servs. Corp.*, 870 F. Supp. 295, 299 (D. Haw. 1994) (ADA preempted suit against corporation that serviced and maintained jet bridges used at airports).  Concluding that the ADA can preempt claims against both Frontier and Hallmark, the Court will determine whether it preempts the claims against both Defendants here.

The claims at issue here plainly do not relate to "prices" or "routes," and Defendants do not argue that they do.  The issue is whether Plaintiffs' claims relate to Frontier's "services," and the question becomes what are an air carrier's "services"?  The Court lacks clear precedent on that question.  The Courts of Appeals have taken "directly conflicting positions" on the meaning of the term "service" in this portion of the ADA with some adopting a narrower definition and others "a much broader definition."  *Nw. Airlines, Inc. v. Duncan*, 531 U.S. 1058 (2000) (O'Connor, J., joined by Rehnquist, C.J., and Thomas, J., dissenting from the denial of

certiorari). *Compare Charas v. TWA*, 160 F.3d 1259 (9th Cir. 1998) (en banc) (holding "service" encompasses "'the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail,'" but not the "'provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities.'"), *and Taj Mahal Travel, Inc. v. Delta Airlines Inc.*, 164 F.3d 186, 194 (3d Cir. 1998), *with Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc) (defining "service" in terms of the "'[contractual] features of air transportation,'" including "'ticketing, boarding procedures, provision of food and drink, and baggage handling'"), *and Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) ("Undoubtedly, boarding procedures are a service rendered by an airline."), *and Travel All Over The World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433 (7th Cir. 1996) (adopting definition in *Hodges*).

The Eighth Circuit has noted the "disagreement about the meaning of 'service,'" but has not explicitly approved of either definition. *See Watson*, 870 F.3d at 817. However, in *Watson*, a unanimous en banc opinion, the Eighth Circuit chose to "assume for the sake of analysis that the broader meaning is correct." *Id.* at 818. The broader meaning, it concluded, was "[c]onsistent with" *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 226 (1995), which found that a passenger's claim involving upgrading travel classes was "related to 'service.'" *Watson*, 870 F.3d at 818. Though assuming the broader definition applied, the Eighth Circuit made clear that some state actions "may affect prices, routes, or services 'in too tenuous, remote, or peripheral a manner to have pre-emptive effect.'" *Id.* (quoting *Morales*, 504 U.S. at 390). "[T]he state laws whose 'effect' is 'forbidden' under federal law are those with a 'significant impact' on carrier rates, routes, or services." *Watson*, 870 F.3d at 817 (quoting *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 375 (2008)). Thus, the Court will endeavor to determine whether Frontier's

- 10 -

actions were related to services, and, if so, whether Plaintiffs' claims are of the type that would have a significant impact on those services.

Courts that follow the broader definition of "service" have determined that boarding and boarding procedures are services under the ADA. *See, e.g.*, *Bower v. Egyptair Airlines Co.*, 731 F.3d 85, 95 (1st Cir. 2013) (finding that to allow or prevent passenger from boarding constitutes a "service" for the purposes of the ADA); *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) ("Undoubtedly, boarding procedures are a service rendered by an airline."); *Doe v. Delta Airlines, Inc.*, 129 F. Supp. 3d 23, 36 (S.D.N.Y. 2015) (noting defendant-airline was "surely correct" that handling of unruly passengers during boarding procedures constitutes a service), *aff'd*, 672 F. App'x 48 (2d Cir. 2016).

If boarding and boarding procedures (*i.e.*, getting people on the airplane) are services then deplaning or the disembarking procedures (*i.e.*, getting people off the airplane) surely are services as well. Indeed, courts have found that removing passengers from an airplane falls within an airline's services. *See, e.g.*, *Xiaoyun Lu v. AirTran Airways, Inc.*, No. 1:13-cv-1846-CC, 2015 WL 5936934, at *4 (N.D. Ga. Mar. 31, 2015) (concluding the alleged wrongful removal from an airplane falls within the scope of "service" under the ADA), *aff'd*, 631 F. App'x 657 (11th Cir. 2015); *Rombom v. United Air Lines, Inc.*, 867 F. Supp. 214, 224 (S.D.N.Y. 1994) (finding decision to have passenger arrested is a service "if it is the only way to remove a passenger who refuses to disembark.").

Courts also have found that resolving seating disputes fits in the broad definition of service. *See, e.g.*, *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 364 (S.D.N.Y. 2008) (noting claims related to flight attendant's efforts to locate appropriate seat assignments and resolve seat conflicts "are clearly airline services"), *aff'd*, 337 F. App'x 7 (2d Cir. 2009); *Peterson v. Cont'l Airlines, Inc.*, 970 F. Supp. 246, 250 (S.D.N.Y. 1997) (same). Here, the entire

- 11 -

fracas arose during the boarding process from Defendants telling Plaintiffs where they could and could not sit, and it lasted through Defendants' decision not to permit Plaintiffs to travel on the flight and their subsequent removal from it.

The Court concludes that the general manner of how an air carrier removes a passenger constitutes as a service under the ADA.  Further, the Court concludes that the state action by way of a tort claim would not have a mere tenuous, remote, or peripheral effect on service but rather a significant impact.  *See Watson*, 870 F.3d at 817.  As another district court has put it: "Transportation is of the most important provisions of service anticipated by a passenger from an air carrier.  When an air carrier refuses to transport a passenger or excludes a passenger from a plane, that decision directly affects service, especially when the decision is related to a safety issue." *Xiaoyun Lu*, 2015 WL 5936934, at *4.

That is not to say that a plaintiff could never state a claim against an air carrier, which the ADA did not preempt, stemming from the way the air carrier removed the plaintiff from an airplane.  But, here, Plaintiffs do not bring the types of claims some other courts have found the ADA did not preempt, like intentional infliction of emotional distress, a personal injury, or discrimination.  *See, e.g.*, *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1258 (11th Cir. 2003) (noting state law personal injury claims are not pre-empted, as evidenced by the fact that the ADA, 49 U.S.C. § 41112(a), requires airlines to carry liability insurance for bodily injury, death, and property damage); *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 365 (S.D.N.Y. 2008) (finding claims of allegedly discriminatory seat reassignment are not preempted under the ADA), *aff'd*, 337 F. App'x 7 (2d Cir. 2009).

Rather than point to a specific wrong, Plaintiffs assert in their negligence per se claim, prima facie negligence claim, and prima facie intentional tort claim that the general manner by which Defendants removed them from the airplane was tortious.  But Plaintiffs describe—and

bring suit over—the way Defendants provided their services.  The ADA preempts claims that relate to Defendants' services—even services allegedly performed in a rude manner.  *See Koutsouradis v. Delta Air Lines, Inc.*, 427 F.3d 1339, 1344 n.2 (11th Cir. 2005) ("[P]assenger handling and courteousness relate to the heart of services that an airline provides.  These services are inherent when you board an airplane.  The basis of [this] claim was personal rudeness, wonton interference and lack of good treatment.  If a passenger is unhappy with . . . the way he or she [is] treated, such individual is free never to fly that airline again."); *Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 406 (S.D.N.Y. 2015) ("in cases where the underlying allegations or facts reveal that the defendants were only carrying out their services, even if in a 'rude, indifferent, and uncaring' manner, courts have found that those claims are still related to the airline services."), *aff'd*, 649 F. App'x 5 (2d Cir. 2016); *Adamore v. Sw. Airlines Corp.*, Civ. A. No. H-11-0564, 2011 WL 6301398, at *5 (S.D. Tex. Dec. 15, 2011) (concluding ADA preempted state tort claims stemming from an agent's "rude, demanding, and crass conduct" while agent acted "very hostile," "uncompassionate," threatened plaintiff with a higher fare, and asked plaintiff to leave the premises).  Counts II, III, and IV will be dismissed as preempted.

Plaintiffs' false imprisonment claim is a different story.  While the time Plaintiffs spent in the jet bridge after their removal from the airplane could be seen as an extension of the removal process and thus part of the service, at this stage, viewing the facts in the light most favorable to Plaintiffs, they have stated a claim for false imprisonment that, *as pleaded*, is not necessarily preempted by the ADA.  The Court of Appeals for the Fourth Circuit has noted as an example that if an airline "held a passenger without a safety or security justification, a claim based on such actions would not relate to any legitimate service and would not be preempted."  *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998).  That is the scene Plaintiffs set here.  Plaintiffs allege that in the jet bridge, Young stood closest to the plane and knew that Plaintiffs could not

return to the plane since she had removed them.  Plaintiffs allege that Young, knowing this, "pushed past" them as she walked towards the terminal and closed the door with Plaintiffs on the other side.  Doc. [1-1] ¶ 95.  They allege that she imprisoned them "knowingly" and with an "evil motive."  *Id.* ¶¶ 175, 179.  And, again, viewing the Complaint in a light most favorable to Plaintiffs, they spent up to ten minutes locked in the jet bridge, which would seem to detach any continuation of the airline's service in removing them from the aircraft.[7]

Discovery may reveal that a safety or security justification existed to hold Plaintiffs in the jet bridge.  Perhaps keeping them in the jet bridge for that time was in the best interest of their safety or the safety of others.  Or maybe another law or regulation required the terminal door to be shut and locked.  Or possibly the detention could have been justified as an extension of the detention to which Plaintiffs consented when boarding the airplane.  *C.f. Abourezk v. N.Y. Airlines, Inc.*, 895 F.2d 1456, 1458 (D.C. Cir. 1990) (finding detention of airline passenger "restrained against his will" was lawful because airline was justified in refusal to allow passenger to deplane due to the "incredibly busy and dangerous business of common-carrier air transport").  But at this procedural posture, the Court finds that the Plaintiff, *as pleaded*, has stated a plausible claim for false imprisonment under Missouri law that the ADA may not preempt.

### b.  Failure to State a Claim

Even if the ADA did not preempt Counts II, III, and IV, the Court would grant the Motion to Dismiss on those three for failure to state a claim upon which relief can be granted.  *See, e.g.*, *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 367 (S.D.N.Y. 2008) ("To the

---

[7] The Court declines to strike the punitive damages pleaded for this count of false imprisonment given that Plaintiffs' pleaded facts indicate Defendants' agent acted intentionally.  *See Rock Port Mkt., Inc. v. Affiliated Foods Midwest Coop., Inc.*, 532 S.W.3d 180, 187 (Mo. Ct. App. 2017) ("To state a claim for punitive damages, the pleadings must allege facts indicating the defendant maliciously, willfully, intentionally, or recklessly injured the plaintiff by his tortious act.").  The Court denies the Motion in that respect.

extent that this action is not preempted by the Airline Deregulation Act, plaintiff nevertheless has failed to state a cognizable claim under New York law, which constitutes an independent ground for dismissal.  Put simply, although the conduct of the flight attendant and other personnel alleged in the complaint may have jeopardized the goodwill of a Continental customer, it clearly does not rise to the level of a tort."), *aff'd*, 337 F. App'x 7 (2d Cir. 2009).

Defendants argue that Count II, the negligence per se claim, must be dismissed since it is based on the TICKETS Act, which was not in effect at the time the events in this case transpired. Plaintiffs did not cite, and the Court did not locate, a Missouri case for negligence per se using a standard of care from a federal statute not yet in effect at the time of the event at issue.  For this independent reason, the Court will dismiss Count II.  *See, e.g.*, *Little v. Budd Co.*, 339 F. Supp. 3d 1202, 1220 (D. Kan. 2018) ("Because the two [federal] statutes did not apply to manufacturers when plaintiff's father allegedly was exposed to asbestos-containing pipe insulation, the court cannot apply the standards contained in those statutes retroactively to impose liability on defendant in the form of a state law claim for negligence per se."), *aff'd*, 955 F.3d 816 (10th Cir. 2020).

On Count III, the negligent manner of removal claim, Plaintiffs have not provided the Court with any cases finding even remotely similar conduct breached any duty, let alone the duty to provide "the highest degree of care to *safely transport* [ ] passengers and *protect* them *while in transit*," *Boyette v. Trans World Airlines, Inc.*, 954 S.W.2d 350, 354 (Mo. Ct. App. 1997) (emphasis added), the duty Plaintiffs allege Defendants owed them.  If Defendants did owe them that duty—even though Defendants did not *transport* them and Plaintiffs were never in *transit*— Plaintiff has provided no Missouri caselaw showing the duty to provide safe transport and to protect while in transit includes protecting from things like "inconvenience" and

"embarrassment." Doc. [1-1] ¶ 167. For this independent reason, the Court will dismiss Count III.

On Count IV, while some Missouri courts have recognized prima facie torts "nominally," they "do not look upon them with favor and have consistently limited the[ir] application." *Billingsley v. Farmers All. Mut. Ins. Co.*, 555 S.W.3d 1, 6 (Mo. Ct. App. 2018) (reversing awards of actual and punitive damages on prima facie tort). Missouri's appellate courts have never affirmed a case resulting in a verdict for the plaintiff on a prima facie tort, which has led some Missouri legal scholars to describe the prima facie tort as "more of an abstraction than a viable tort action." 34 Robert H. Dierker & Richard J. Mehan, *Missouri Practice Series: Personal Injury and Torts Handbook* § 37:1 (2020 ed.).

Here, however, it is not even a viable abstraction because Plaintiffs have not pleaded facts showing Defendants lacked a justification for their lawful act. Plaintiffs pleaded the bald legal conclusion that "there was no justification and/or there was insufficient justification for Defendants' removal of Plaintiffs from the plane," Doc. [1-1] ¶ 172, but the Court does not assume that legal conclusion couched as a factual allegation is true. The facts Plaintiffs do plead show Branch and Syed repeatedly disregarded instructions on their seat assignments and interfered in the crewmembers' seating of others. Air carriers have immense discretion in removing passengers or preventing them from flying. *See, e.g.*, *Al-Watan v. Am. Airlines, Inc.*, 658 F. Supp. 2d 816, 823 (E.D. Mich. 2009). As such, the Court finds Plaintiffs did not meet the "difficult burden of pleading" the "lack of justification for [Defendants'] lawful act." *See* Dierker & Mehan, *Personal Injury and Torts Handbook*, *supra*, at § 37:1; *see also* Doc. [1-1] ¶ 170 (noting Plaintiffs' removal from plane was not unlawful). For this independent reason, the Court will dismiss Count IV.

Plaintiffs' experience may have been unfortunate, but the facts Plaintiffs allege do not state viable claims in Counts II, III, and IV regardless of preemption.  As one district court aptly put it, "[n]ot every unfortunate incident that occurs in life, not every discomfort, not every unsatisfactory commercial transaction, not every disagreement among people and/or corporations, gives rise to a cause of action."  *Lee v. Gen. Motors Corp.*, 950 F. Supp. 170, 175 (S.D. Miss. 1996).

Accordingly,

**IT IS HEREBY ORDERED** that that the Defendants' Motion to Dismiss and to Strike, Doc. [10], is **GRANTED in part** and **DENIED in part**.  Counts II, III, and IV are **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiffs may file an Amended Complaint within twenty-one (21) days of this Order.

Dated this 25th day of February 2021.

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE